IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 19, 2015


**IN RE ALLEYANNA S.**


**Appeal from the Juvenile Court for Smith County**
**No. 2014JV252      Michael W. Collins, Judge**

_____


**No. M2015-00544-COA-R3-PT – Filed February 19, 2016**
_____


This appeal arises from the termination of a mother's and a father's parental rights. On a petition for dependency and neglect, the juvenile court on an emergency basis removed the child from the parents. The parents later stipulated that the child was dependent and neglected, and the court made a finding that the child was a victim of severe child abuse at the hands of both parents. More than seven months later, the Tennessee Department of Children's Services filed a petition to terminate parental rights based on the previous finding of severe child abuse by both parents and on the ground of willful abandonment for failure to support by the father. The trial court found clear and convincing evidence for both grounds and that it was in the best interest of the child to terminate parental rights. Both parents appeal. We affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Jacquelyn M. Scott, Carthage, Tennessee, for the appellant, Nataley S.

Brandon J. Cox, Smithville, Tennessee, for the appellant, Eddie S.

Herbert H. Slatery III, Attorney General and Reporter, and Rachel E. Buckley, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I. FACTS AND PROCEDURAL HISTORY

Eddie S. ("Father") and Nataley S. ("Mother") are the parents of Alleyanna S. At the time of her birth, the Tennessee Department of Children's Services ("DCS") received a referral based on concerns that Alleyanna had been exposed to drugs. Mother and Father both tested positive for opiates. Father claimed to have prescriptions for oxycodone and other pain medications. Mother admitted she had taken Father's oxycodone during her pregnancy.

As a result of the referral, on February 7, 2014, DCS filed a petition in the Juvenile Court for Smith County, Tennessee, seeking to declare Alleyanna and her sibling[1] dependent and neglected and requesting approval of a protective supervision plan. The protective supervision plan would have permitted the children to remain with Father and Mother subject to certain conditions and limitations. *See* Tenn. Code Ann. § 37-1-130(a)(1) (2014). DCS's approach changed, however, when it learned that Alleyanna's cord blood tested positive for oxycodone and hydrocodone. Based on the cord blood test results and a second referral concerning possible physical abuse to the sibling, DCS filed an amended petition to declare the children dependent and neglected, this time requesting temporary legal custody of Alleyanna.

After a hearing, the juvenile court declared Alleyanna dependent and neglected. The court also found Alleyanna was a victim of severe child abuse, as defined by Tennessee Code Annotated § 37-1-102(b)(21),[2] perpetrated by her parents. Both parents stipulated that Alleyanna was dependent and neglected and to the court's findings of fact. Neither parent appealed the final order.

On March 20, 2014, DCS established an initial permanency plan, which was amended on August 19, 2014.[3] Before the parents could regain custody of Alleyanna, they were required to show that they were drug-free, financially stable, and that their home was safe

---

[1] Alleyanna S. has an older sibling who is not a party to this case.

[2] "Severe child abuse" includes "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(21) (2014).

[3] The Petition to Terminate Parental Rights references a March 20, 2014 permanency plan that was ratified by the juvenile court on June 16, 2014. The only permanency plan in the record is dated August 19, 2014.

and appropriate. To achieve these goals, the parents had the following relevant responsibilities: (1) participate in alcohol and drug assessments and follow any recommendations; (2) undergo random drug screens and pill counts; (3) provide a notarized medical affidavit from a medical provider listing all prescribed medications and dosages; (4) establish financial self-sufficiency and provide proof; and (5) maintain stable housing. The plan also required Mother to participate in a mental health assessment and follow all recommendations. Both parents were directed to pay child support. They were also required to provide "in kind items," such as clothing and diapers, for Alleyanna.

On September 25, 2014, DCS filed a petition to terminate both parents' parental rights in the juvenile court. DCS asserted multiple grounds for termination of parental rights in its petition but, at the hearing, chose to pursue only two grounds: severe child abuse and willful failure to support by Father.

A. HEARING ON TERMINATION OF PARENTAL RIGHTS

On February 4, 2015, the juvenile court held a hearing on the petition and heard the testimony of Mother, Father, two family service workers, and Alleyanna's foster mother ("Foster Mother"). Much of the testimony centered on compliance with the original permanency plan, particularly the requirements related to drug use, financial sufficiency, and housing.

After Alleyanna was placed in DCS custody, both parents completed alcohol and drug assessments. Mother's assessment resulted in a referral for intensive outpatient treatment. Mother also began receiving mental health treatment from Mental Health Cooperative.[4]

Mother only attended the drug and mental health programs sporadically. She dropped out of the program with Mental Health Cooperative in mid-April. That same month, Bradford Health Services, which provided drug addiction treatment, discharged Mother due to unexcused absences. Mother then tested positive for oxycodone in June. After a second alcohol and drug assessment recommended inpatient drug therapy, Mother was admitted to Buffalo Valley. She completed the drug addiction program on July 7 but tested positive for oxycodone and opiates on August 6. In August, Mother also learned that she was pregnant again.

On September 15, 2014, Mother went to the emergency department of Vanderbilt University Medical Center. She told the hospital personnel she was pregnant and had been

---

[4] Mother had been diagnosed with post-traumatic stress disorder and depression and had received mental health counseling at various times since she was fifteen years old.

3

snorting drugs. Mother was admitted to Vanderbilt for inpatient drug treatment, where she stayed until September 23. After her discharge, Mother started receiving mental health and drug addiction services from Vanderbilt on an outpatient basis. Since her admission to Vanderbilt, Mother's DCS drug screens have been negative.

Although Father's initial alcohol and drug assessment did not recommend treatment and his March 2014 drug screen was negative, one of the family service workers testified to concerns over Father's drug use. According to her, every time she asked for a pill count, Father's "medications seemed to change." In June 2014, Father tested positive for controlled substances for which he had no prescription. In August, Father had a clean drug screen even though he had been prescribed hydrocodone. In January 2015, Father tested positive for suboxone for which he produced a prescription.

Father testified that he suffered from chronic neck and back pain for which he had been prescribed a variety of pain medications. In May 2014, Father sought treatment from Interventional Pain Center. According to medical records introduced as an exhibit at the hearing, Father failed drug tests at the clinic in May and September 2014 by testing positive for drugs for which he had no prescription. In May, Father tested positive for oxycodone, and in September, Father tested positive for lorazepam and hydrocodone. Ultimately, in October 2014, Interventional Pain Center discharged Father for multiple pain contract violations. For his part, Father claimed that he was unaware of the failed drug tests and that his violations of the pain contract were missing an appointment and failing to provide his pill bottle.

Although he had seen three different medical providers for pain management, the family service workers testified that Father never provided a notarized affidavit from his providers listing his prescription medications and dosages. Providing such an affidavit was a requirement of the permanency plan. Father produced only one such affidavit, which he failed to have notarized.

The testimony painted a bleak picture concerning the parents' finances. Neither parent paid child support while Alleyanna was in foster care. Mother never had a job or paid her own bills. She dropped out of school after the ninth grade, and as of the date of the hearing, she did not have a driver's license. During Mother's marriage, Father and his mother had been the primary means of support for Mother.

The trial court heard conflicting testimony regarding Father's financial sufficiency. Father testified to working full time for a roofing company in March and April 2014. He initially claimed that he left the company when he injured his back on the job. Later, he claimed that he was discharged due to excessive absences. Father attributed those absences

4

to appointments he had to attend because of Alleyanna's removal.

According to a family service worker, on August 1, 2014, Father reported he was working for "water control." On September 3, Father said he was working at a detail shop in Gallatin. On September 10, Mother reported Father was working at an unspecified job in Ashland City. On September 30, Father reported to DCS that he was working full time for a roofing company, making $14 per hour. However, DCS never obtained verification of employment during this time period.

Father claimed to have applied for social security disability benefits at some point in 2014. Based on his belief that full-time employment would hinder his application, Father chose to only work "a little bit here and there, just to — so we could get by." Although he claimed he provided medical records to DCS evidencing his disability, a family service worker testified she had no documentation of Father's disability claim. Father admitted he never obtained a doctor's statement that he was physically unable to work.

Father was questioned extensively about his ability to work prior to the petition for termination of parental rights. At different times, Father testified he could not work a full-time job because of neck pain, his use of pain medication, his application for social security disability benefits, and the multiple appointments necessary to meet the requirements of the permanency plan. When asked how he paid the bills during this time period, he stated "he was able to make money when he needed to."

Father testified he is currently employed detailing cars at an automobile dealership in Kentucky. He is paid $65 per car. Father provided DCS some handwritten receipts showing income of approximately $400 for December 2014 and January 2015. According to Father, he is now able to work full time because a change in his medications made him feel more like working.

As for housing, the parents' living situation had changed over the course of the case. Soon after Alleyanna was born, her parents moved into a trailer park in Gallatin, Tennessee. The family service workers testified to some concerns about the residence, including a severe roach infestation, but the parents were evicted for nonpayment of rent on November 16, 2014. After the eviction, Mother lived with various friends and relatives, and Father spent several weeks in jail in both Tennessee and Kentucky. With the help of family members, he posted a $5,000 bond, leading to his release on December 1, 2014.

On December 15, 2014, the parents moved into subsidized housing in Glasgow, Kentucky, and on January 1, 2015, they signed a one-year lease. The parents did not notify DCS of their new address until January 13. They testified they moved to "get away from all

of the drama." When asked why they did not move somewhere in Tennessee, Mother testified she really did not want to live in Tennessee. Both parents testified the Kentucky apartment is safe and appropriate for a toddler, but because the home was located out-of-state, DCS had been unable to assess the suitability of the home.[5]

### B. THE ORDER FOR TERMINATION OF PARENTAL RIGHTS

The juvenile court found DCS had proven, by clear and convincing evidence, grounds for terminating both parents' parental rights. The court found termination appropriate because both parents had previously been found to have perpetrated severe child abuse. Further, the court found Father had abandoned the child by willfully failing to support her for the four months immediately preceding the filing of the petition to terminate. The court found Father: (1) was "able bodied and capable of working and supporting the child"; (2) "was aware of his duty to support the child"; (3) "has worked in the four months prior to the petition being filed"; and (4) "has not provided any of this income for the benefit of his child."

The court also found termination of parental rights to be in Alleyanna's best interest. The court pointed to several factors supporting this finding. The parents' "ongoing mental health and drug issues" had not been sufficiently remedied. The parents committed severe child abuse against both Alleyanna and a second unborn child. A change of caregiver would have a negative impact because Alleyanna has a meaningful relationship with the foster family, but not her parents. The parents' previous home was unsuitable, and the status of the current home could not be ascertained because of the parents' move to Kentucky. The court also noted parents' issues with criminal activity and controlled substances and found their mental or emotional state would be detrimental to the child. Finally, the parents had not paid child support consistent with the child support guidelines.

### II. ANALYSIS

Both the state and the federal constitutions protect a parent's right to the custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). Termination proceedings are governed by statute. Tenn. Code Ann. § 36-1-113 (Supp. 2015). Only when a statutory ground for termination exists and termination is in the best interest of the child will a court interfere with this constitutionally protected right. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The party seeking

---

[5] One of the family service workers testified her superiors denied her request to visit the Kentucky apartment; however, she also explained DCS could request that a home study be performed by Kentucky authorities.

termination has the burden of proof. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Both the existence of a statutory ground for termination and that termination is in the best interest of the child must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine,* 79 S.W.3d at 546.

## A. STANDARD OF REVIEW

We review the juvenile court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013). *See* Tenn. R. App. P. 13(d). Next, we assess whether those facts constitute clear and convincing evidence that "one of the statutory grounds for termination exists and if so whether the termination of parental rights is in the best interests of the [child]." *In re Adoption of Angela E.*, 402 S.W.3d 636, 639-40 (Tenn. 2013). "Clear and convincing evidence is 'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)).

Here, both parents appeal. Mother does not challenge the trial court's finding that grounds exist to terminate her parental rights. Her appeal concerns the trial court's best interest analysis. Father, however, challenges both grounds for termination and whether termination is in the child's best interest. In addition, Father challenges the sufficiency of the juvenile court's order, and Mother raises an evidentiary issue. We address the court's order and the evidentiary issue first.

## B. SUFFICIENCY OF JUVENILE COURT'S ORDER

An integral part of the parental termination statute is the requirement for the trial court to make specific findings of fact and conclusions of law. *See* Tenn. Code Ann. § 36-1-113(k) (Supp. 2015). These findings are necessary to "facilitate appellate review" and to safeguard the important rights at stake in a termination proceeding. *In re Angela E.*, 303 S.W.3d at 251. If the requisite findings are not made, we must remand the case to the trial court with directions to make appropriate findings. *Id.* at 255. Father complains that the trial court's order does not contain specific findings of fact as required by statute.

We have determined the court's final order meets the requirements of Tennessee Code Annotated § 36-1-113(k). While we would prefer findings to be as detailed as possible, the court adequately stated the basis of its decision. *See In re Robert B.*, No. W2012-00006-COA-R3-PT, 2012 WL 2849512, at *5 (Tenn. Ct. App. July 12, 2012) (rejecting the argument that the court's order lacked specific findings after looking at the order as a whole);

*M.D. v. R.L.H.*, No. E2005-00324-COA-R3-PT, 2005 WL 3115874, at *4 (Tenn. Ct. App. Nov. 22, 2005) (finding court order met statutory requirements even though it was "quite sparse").

Father also complains that the court's entry of a proposed order submitted by counsel for DCS was contrary to its responsibility to decide this case independently. A trial court may adopt submitted findings of fact and conclusions of law as long as the adopted order reflects its own independent and deliberate decision making. *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 315-316 (Tenn. 2014).

Nothing here indicates that the juvenile court failed to exercise its own independent and deliberate decision making. In fact, the court was actively involved in the hearing and announced its decision from the bench before accepting counsel's offer to draft a proposed order. *See In re Gabriel V.*, No. M2014-01500-COA-R3-JV, 2015 WL 3899409, at *10 (Tenn. Ct. App. June 24, 2015) (rejecting the argument the final order did not represent an independent judgment because "the trial court judge was very involved with the trial of this case, interjecting during different witnesses' testimony to ask questions and clarify issues"). Any discrepancies between the court's statements from the bench and the final order were minor. To the extent that the order contains findings not explicitly made by the court at the conclusion of the hearing, the findings do not contradict the court's statements from the bench. Under these circumstances, we cannot conclude the findings in the order are anything other than the product of the court's own decision making.

## C. Admission of Case Reports

Mother argues the trial court erred in admitting the case reports written by the family service workers as an exhibit at the termination hearing. After Mother offered one favorable case report into evidence, DCS objected, arguing all of the case reports should be admitted for context, and the court agreed. Mother's sole objection below was that three of the reports should not have been admitted because they were created more than thirty days after the events reflected in the reports.

The case reports are hearsay. *See* Tenn. R. Evid. 801(c). Under the hearsay rule, hearsay evidence is excluded except as otherwise provided by the rules or statute. Tenn. R. Evid. 802. Tennessee Rule of Evidence 803 includes a number of exceptions to the hearsay rule. At the hearing, both counsel for Mother and DCS treated the case reports as if they potentially fell within the business records exception. The business records exception has five requirements:

1. The document must be made at or near the time of the event

8

recorded;

2. The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

3. The person providing the information in the document must be under a business duty to record or transmit the information;

4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

*In re Demitrus M.T.*, No. E2009-02349-COA-R3-CV, 2011 WL 863288, at *19 (Tenn. Ct. App. Mar. 14, 2011); Tenn. R. Evid. 803(6). Mother's argument is that DCS failed to establish the first requirement of the business records exception.

Whether or not the case reports were properly admitted under the business records exception, we conclude Mother's argument is unavailing. The admission or exclusion of evidence is a discretionary decision. *In re Melanie T.*, 352 S.W.3d 687, 698 (Tenn. Ct. App. 2011). However, a conclusion that a trial court abused its discretion and improperly admitted evidence does not end the inquiry. Even if the evidence is improperly admitted over objection, we must also determine whether the admission of the evidence affected "a substantial right of the party." Tenn. R. Evid. 103.

For all but three of the case reports, we conclude a substantial right of Mother was not affected by admission of the reports. In all but three instances, one of the two family service workers who testified at the hearing prepared the report, and therefore, Mother's counsel had the opportunity to question the declarants regarding their case reports.

For the three reports not prepared by one of the testifying family service workers, we conclude that the admission of the reports was harmless error. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). The three reports were created on February 11 and 26, 2014, and relate to the initial referral regarding Alleyanna and her removal. As such, the case reports reflect matters that the parents stipulated to in the dependency and neglect proceeding. In addition, Mother has not

9

explained how any of the case reports impacted the outcome of the trial or prejudiced the judicial process. From our review of the court comments during the hearing and its order, we find no reference to the case reports. The court clearly stated that it was relying on the prior adjudication of severe abuse for one of the grounds for termination and the focus of the other ground for termination is not addressed in any of the reports. We also find no indication that the court relied on the case reports for its best interest determination.

## D. STATUTORY GROUNDS FOR TERMINATION

### 1. Severe Child Abuse

We have previously held a mother's drug use while pregnant may constitute severe child abuse to the unborn child. *In re Benjamin M.*, 310 S.W.3d 844, 850 (Tenn. Ct. App. 2009). We have also held a father who knows his wife is using drugs while pregnant can commit severe child abuse. *In re Joshua E.R.*, No. W2011-02127-COA-R3-PT, 2012 WL 1691620, at *5-6 (Tenn. Ct. App. May 15, 2012).

The trial court based its finding of severe child abuse solely on the Adjudicatory and Dispositional Hearing Order from the dependency and neglect proceeding. Father argues the trial court erred in relying solely on the previous finding. As we have said before, "[t]he most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights." *In re J.C.H.*, No. W2012-01287-COA-R3-PT, 2012 WL 6466631, at *10 (Tenn. Ct. App. Dec. 14, 2012) (quoting *Tenn. Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)). "[O]nce the finding of severe child abuse in the dependency and neglect proceedings becomes final, '[t]he ground itself is proved . . . and the issue of whether abuse occurred is not re-litigated at the termination hearing.'" *Id.* (quoting *Tenn. Dep't of Children's Servs.*, 2005 WL 549141 at *10).

The finding of severe child abuse is res judicata in this proceeding. *See In re Heaven L.F.*, 311 S.W.3d 435, 439-40 (Tenn. Ct. App. 2010) ("Therefore, the issue of whether Mother committed severe child abuse is *res judicata* and the trial court properly found by clear and convincing evidence that Mother's parental rights should be terminated."). As such, we find clear and convincing evidence that both parents committed severe child abuse against Alleyanna.

### 2. Abandonment by Willful Failure to Support

Termination of parental rights may be initiated on the basis of abandonment. Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2015). In this context, "[a]bandonment is defined as the

willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.,* 402 S.W.3d at 640; *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2015). Here, because the petition was filed on September 25, 2014, the relevant four month period is May 24, 2014 to September 24, 2014. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

Whether a parent failed to support a child is a factual question, but whether the failure was willful for the purposes of the parental termination statute is a question of law. *In re Malaki E.*, M2014-01182-COA-R3-PT, 2015 WL 1384652, at *6 (Tenn. Ct. App. Mar. 23, 2015). On appeal, Father does not dispute that he paid no child support during the relevant time period.[6] Instead, Father argues his failure to pay was not willful.

Mere failure to pay support is not enough. The failure to pay must be willful. Tenn. Code Ann. § 36-1-102(1)(A)(i). "The element of willfulness has been held to be both a statutory and a constitutional requirement." *In re C.T.B.*, No. M2009-00316-COA-R3-PT, 2009 WL 1939826, at *4 (Tenn. Ct. App. July 6, 2009)). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

The juvenile court, in determining Father willfully failed to support Alleyanna, did not rely on Father's income. The court found Father was able to work, did some work, and did not use any of his income to support his child. When a parent is able to work but is not seeking employment, the failure to pay support can be deemed willful. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). *See In re Jacob A.G.*, No. E2012-01213-COA-R3-PT, 2013 WL 357573, at *5-6 (Tenn. Ct. App. Jan. 30, 2013) (finding willfulness where parent had not worked while her children were in state custody and the only evidence that parent sought employment was "her testimony that she submitted applications at 'all the different places around town'"); *In re Austin D.*, No. E2012-00579-COA-R3-PT, 2013 WL 357605, at *12 (Tenn. Ct. App. Jan. 30, 2013) (finding mother's personal choice not to work contributed to the conclusion that she willfully failed to pay child support).

---

[6] Father did provide some diapers, clothes and toys. The trial court found these gifts to be mere token support that did not meet Father's child support obligation. *See In re Adoption of Angela E.*, 402 S.W.3d at 641 ("Token support payments are not sufficient to preclude a finding of a willful failure to support.").

11

Clear and convincing evidence supports the trial court's determination that Father willfully failed to support his daughter. Father was aware of his obligation to support Alleyanna. The plan of care developed by DCS and the parents specifically addressed the need for the parents to pay child support, and a family service worker discussed the need to pay support with the parents at the child and family team meeting on March 20, 2014. Father had the capacity to pay support. He admitted he chose not to work full time but to take odd jobs to "get by." In fact, he told a family service worker that he could work and make money when he needed to. Father had money for rent, utilities, gas, food, cigarettes, and pain medication but not the "extra money" to contribute to his daughter's care.

Father also had no justifiable excuse for not paying child support. Father testified to a litany of reasons he could not work: his neck pain, his decision to apply for social security disability benefits, the effect of his pain medications, and his involvement in this case. However, he never produced medical evidence to DCS that he was physically unable to work, and the trial court credited none of the excuses. The court did not find Father to be a credible witness, which is an assessment we do not overturn on appeal "absent clear and convincing evidence to the contrary." *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011).

## E. BEST INTEREST

As we have determined grounds exist for termination of parental rights, we now examine the best interest of Alleyanna. The focus of the best interest analysis is on the child, not the parent. *In re Malaki E.*, 2015 WL 1384652 at *12. Tennessee Code Annotated § 36-1-113(i) lists nine factors for courts to consider in determining whether it is in the child's best interest to terminate parental rights. Tenn. Code Ann. § 36-1-113(i) (Supp. 2015). The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-194 (Tenn. Ct. App. 2004). The court's job is to weigh the evidence in light of the statutory factors and any other relevant factors to determine the best interest of the child. *Id.*

The trial court found all but one of the statutory factors favor termination. Father and Mother argue the evidence does not support the trial court's findings of fact in its best interest analysis. We have reviewed the record, and while we do not find support for all of the trial court's findings, nevertheless, we agree that there was clear and convincing evidence that termination of parental rights is in Alleyanna's best interest.

Factor (1) focuses on whether the parents have made such an adjustment in their lives that it would be safe to return the child to their care. Tenn. Code Ann. § 36-1-113(i)(1) (Supp. 2015). The trial court found Father's and Mother's "ongoing mental health and drug

12

issues" make it unsafe for Alleyanna to return to her parents. Mother has had a lifelong struggle with mental health, and while she was not using drugs at the time of the hearing, she has relapsed as recently as August 2014. Because Father has not met the medical affidavit requirement of the permanency plan, DCS has been unable to verify whether it is medically necessary for him to be taking pain medications and whether his use is in compliance with doctor's orders. While Father is correct the record does not support the finding he has mental health issues, he does have ongoing prescription drug issues that have not been remedied.

Similarly, factor (2) requires the court to examine whether a lasting change appears reasonably possible, given the circumstances of the case and the efforts of the parties. *Id.* § 36-1-113(i)(2). Here, the court found, despite reasonable efforts by DCS, the parents have not made a lasting adjustment. Mother argues she did not have enough time to make a lasting adjustment and DCS could have done more to help her. A family service worker testified she offered to assist Mother in accessing services in a variety of ways, but to no avail. Mother failed to take advantage of the services that were offered. Moreover, the parents chose to move to Kentucky, knowing DCS would be unable to provide services outside of the state. They cannot complain DCS should have done more to help them when DCS's ability to help was limited by their choice to move. Mother and Father have had a full year without the responsibility of caring for their daughter to focus on turning their lives around and have failed to make a lasting adjustment. While both parents have taken steps to remedy their issues, we agree with the juvenile court that factor (2) favors termination.

Factors (3) and (4) concern whether the parents have had regular contact with their child and whether a meaningful relationship has been established. *Id.* §§ 36-1-113(i)(3), (4). The court agreed Mother and Father have consistently visited Alleyanna but found no meaningful relationship had been established. Alleyanna went into foster care when she was seventeen days old. Foster Mother takes care of all of her needs. She only sees her parents once a week during supervised visitation. A family service worker testified that Alleyanna is a friendly child who will willingly go to most people, including her parents. However, she is eager to return to her foster family after each visit. The record supports the court's finding that Alleyanna has a meaningful relationship with her foster family, not her parents.

The court also determined, under factor (5), a change of caretakers would negatively affect Alleyanna. *Id.* § 36-1-113(i)(5). There was no testimony at the hearing as to the effect of a change of caregivers would have on Alleyanna. We find no evidence to support the court's finding.

The next factor requires the court to consider whether the parent has abused the child at issue or another child in the household. *Id.* § 36-1-113(i)(6). The trial court found this factor weighed against the parents because they committed severe child abuse against

13

Alleyanna and their second unborn child. The record supports the trial court's finding. Mother candidly admitted she took illegal drugs while pregnant and knew this was the same behavior that caused DCS to remove Alleyanna from her care. While Father contends there is no evidence he committed severe child abuse a second time, this factor still weighs against him because of his previous abuse of Alleyanna.

Under factor (7), the court examines the parents' home to determine whether it is a safe environment for the child. As part of this inquiry, the court must determine whether there is criminal activity in the home or whether the parents' use of alcohol or controlled substances could render the parent unable to care for the child. *Id.* § 36-1-113(i)(7). The court found the parents "still have issues with criminal activity and controlled substances in their home." The only evidence in the record about the parents' home in Kentucky is the parents' testimony that the home is safe. We recognize the court found the parents' testimony not credible. In the absence of a home study, however, this record does not have sufficient evidence to determine whether this factor weighs for or against the parents.

Factor (8) requires an examination of the parents' mental and emotional state. *Id.* § 36-1-113(i)(8). The court found the "parents' mental or emotional state would be detrimental to the child." As discussed under factor (1), Mother is receiving treatment for ongoing mental health issues. The record is devoid of evidence on the impact her mental health would have on Alleyanna. The preponderance of the evidence does not support this finding.

The final factor concerns whether the parents have paid child support. *Id.* § 36-1-113(i)(9). The court found the parents have not paid child support during the pendency of this case. At least with respect to Father, ample evidence in the record supports this finding.

As we have stated, the best interest analysis is an extremely fact-intensive inquiry. The trial court was not required to find all factors weigh against the parents. Depending on the facts of an individual case, one factor could have more relevance and weight than another. *In re Audrey S.*, 182 S.W.3d at 878. We recognize Mother and Father have taken steps toward sobriety and stability. However, our focus is on what is best for Alleyanna, not her parents. *See In re Jayden G.*, No. W2014-00881-COA-R3-PT, 2014 WL 4922638, at *13 (Tenn. Ct. App. Sept. 30, 2014) (noting Mother's "significant strides towards reunification" but holding the best interests of the child favored termination of parental rights); *In re Keri C.*, 384 S.W.3d 731, 753 (Tenn. Ct. App. 2010) (acknowledging Mother's attempts to overcome her drug addiction but holding termination was in the child's best interest because mother did not have stable housing or employment).

"One of the primary purposes for our statutory system of child removal, foster care,

and adoption is 'to protect [children] from needless prolonged placement in foster care and the uncertainty it provides, and to provide them a reasonable assurance that, if an early return to the care of their parents is not possible, they will be placed in a permanent home at an early date.'" *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *17 (Tenn. Ct. App. June 3, 2003) (quoting Tenn. Code Ann. § 37-2-401(a) (2014)). Mother and Father are currently not in a position to care for Alleyanna, who is at a critical stage in her development. She has a need for occupational, speech, and physical therapy. Her parents willingly moved out of state, knowing this action would prolong her time in foster care. They are asking the court to wait and see if they can maintain their current level of sobriety, provide a safe home, resolve criminal charges pending against Father in Kentucky, and obtain a steady income. They are aware DCS cannot provide them with any services outside of Tennessee. We can only speculate how long it will take to arrange a home study and unsupervised visitation through the appropriate Kentucky authorities. During this time, Alleyanna will continue to live in foster care. Under these circumstances, "we cannot agree that continuing, open-ended foster care is in [Alleyanna's] best interest." *Id*.

### III. CONCLUSION

We find clear and convincing evidence that both parents committed severe child abuse and that Father abandoned his child by willfully failing to pay child support. We also find clear and convincing evidence that termination of Mother's and Father's parental rights is in the best interest of the child. Accordingly, we affirm the decision of the juvenile court.

_____
W. NEAL MCBRAYER, JUDGE

15